UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JUDY SHAW FOUNDATION,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF HOWARD, SOUTH DAKOTA,<br><br>Defendant. | 4:23-CV-04039-KES<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

Defendant, City of Howard, South Dakota, moves for summary judgment on all of the claims brought by Plaintiff, Judy Shaw Foundation (JSF). *See* Docket 25. JSF opposes the City's motion, *see* Docket 30, and makes its own motion for partial summary judgment on all of the City's affirmative defenses, Docket 21. The City has withdrawn some of its affirmative defenses but opposes the remainder of JSF's motion. *See* Docket 33. After reviewing the record, the court issues the following order.

**Factual Background**

The following facts are undisputed:

Since 2014, JSF owned and operated the Howard Hotel and Conference Center (the Property) in Howard, South Dakota. Docket 26 ¶¶ 1-2; Docket 31 ¶¶ 1-2. Howard is located in Miner County, South Dakota. *See generally* Docket 26 ¶ 8. The Property is located in the C-1 Central Commercial District

1

in Howard under Article 19 of the City's zoning ordinance. Docket 34 ¶ 5-6. In March 2022, JSF planned to sell the Property to iRecover US, Inc. Docket 26 ¶ 6; Docket 31 ¶ 6. iRecover operates addiction treatment centers throughout the United States and Canada and intended to use the Property as a residential chemical dependency treatment center. Docket 26 ¶ 7; Docket 31 ¶ 7.

On March 29, 2022, JSF and iRecover signed a contract wherein iRecover agreed to purchase the Property for $1.1 million. Docket 24-2 at 1, 6. Under the contract, iRecover had until April 25, 2022, to complete its due diligence review and obtain a survey if JSF did not already have one available for review. *Id.* at 1, 3.

Before the sale could proceed, certain encumbrances on the Property needed to be resolved. Docket 26 ¶¶ 8-9; Docket 31 ¶¶ 8-9; Docket 28-8 at 6-7; *see* Docket 31 ¶ 10. First, Miner County had acquired title to the Property in November 2021 through a treasurer's tax deed because JSF was delinquent in paying property taxes. Docket 26 ¶ 8; Docket 31 ¶ 8. As a result, for JSF to complete the sale, Miner County was required to agree to reconvey the Property back to JSF. Docket 26 ¶ 9; Docket 31 ¶ 9. Second, prior to closing, iRecover learned that Dave Graf—the realtor who was involved with JSF's purchase of the Property in 2014—was claiming a $100,000 interest in JSF's sale proceeds based on a prior agreement with JSF. Docket 28-8 at 6-7; *see* Docket 31 ¶ 10. iRecover therefore requested written assurances from JSF that it would not be liable for Graf's claim. Docket 28-8 at 9-10. JSF's attorney advised iRecover

2

that Graf did not have a valid claim, but iRecover was not satisfied with that response. *Id.* at 9.

In April and early May of 2022, iRecover also learned about two potential encroachments involving the Property. Docket 26 ¶ 12; Docket 31 ¶ 12; *see* Docket 28-20 (discussing the potential encroachment of the bar's property in April 2022). The first was on the south end, where the Property may have extended onto an adjacent parcel operated as a bar. Docket 26 ¶ 12; Docket 31 ¶ 12. The second was on the north end, where the Property may have encroached on land owned by the City. Docket 26 ¶ 12; Docket 31 ¶ 12. At the time the purchase agreement was executed, iRecover was unaware of either encroachment issue.[1] Docket 28-8 at 8-9. After signing the contract, iRecover commissioned a land survey of the Property, which revealed that the encroachments described above were a "bigger problem" than iRecover initially expected. *Id.* at 20. To allow time for the parties to address these potential issues, the closing on the Property was rescheduled to May 10, 2022. Docket 26 ¶ 26; Docket 31 ¶ 26. On May 6, 2022, iRecover's CEO emailed the

---

[1] While JSF disputes this fact by asserting that iRecover was responsible for conducting a due diligence review and obtaining a survey if one was not already available, the evidence shows—and JSF does not dispute, *see* Docket 31 ¶ 13—that iRecover was unaware of the encroachments *at the time the purchase agreement was signed.* Docket 28-8 at 8-9. Although JSF is correct that iRecover had an obligation to conduct a due diligence review, the purchase agreement specified that iRecover had until April 25, 2022—nearly 30 days after signing—to complete that review. Docket 24-2 at 1. Merely because iRecover had until April 25, 2022, to complete its review does not negate the evidence showing that iRecover did not know about the encroachments at the time the purchase agreement was signed. *See* Docket 28-8 at 8-9.

company's attorney, Kristian Ellendorf, expressing concerns about proceeding with the Property transaction—specifically regarding the potential encroachments, the reconveyance of the Property to the County, and Graf's alleged lien on the Property. Docket 28-8 at 8-10.

As of May 9, 2022, Article 19 of the City's zoning ordinance did not expressly list chemical dependency treatment centers or group homes as permitted uses. *See* Docket 24-4 at 54, 59; *see also* Docket 34 ¶ 6. At the city council meeting on May 9, 2022, the council discussed the proposed sale of the Property, Docket 24-8 at 3-5, and authorized its attorney, Todd Wilkinson, to draft amendments to Howard's zoning ordinance, Docket 34 ¶ 8. Wilkinson later stated that the City wanted him to "try and get some language that was going to allow iRecover to fit into a usage on Main Street" Docket 24-23 at 2. When asked about the legal advice he provided to the council, Wilkinson stated that, in his opinion, the treatment center "did not fit on the permitted [zoning] list and [the City's] best approach would be to put it under a special exception." Docket 35-1 at 12. A city council member also testified Wilkinson advised the council that "based on what [they] knew about what [iRecover] intend[ed] to do, [the existing] ordinance would not allow [iRecover] to operate." Docket 35-2 at 4. Another council member testified that Wilkinson advised that there was no "legal way" to "stop the sale or the operation" of a residential treatment center. Docket 24-8 at 5.

The first proposed amendment, Ordinance 745, would amend Article 17 of the City's zoning ordinance to add definitions for the terms "group home"

and "service establishment." *See* Docket 28-4. Ordinance 745 defined "group home" as "[a] facility that provides living or counseling arrangements for the twenty-four (24) hour care of children or adults, including a facility that provides programs for the treatment of chemical dependency." *Id.*

The second proposed amendment, Ordinance 746, would amend the City's zoning ordinance to add "group home" as a permitted use under the C-1 Central Commercial District's special exceptions provision. Docket 28-5. The special exceptions provision is essentially a variance—that is, it permits the City to allow certain property uses that are not generally permitted under the existing zoning ordinance. *See* Docket 24-4 at 59. When drafting these amendments, Wilkinson was aware that, under South Dakota law, the denial of a special exception is subject to only limited appellate review. Docket 34 ¶ 13.

On May 10, 2022, Wilkinson emailed Ellendorf "to alert" him to a "possible encroachment" of the Property "in[to] the [city] right-of-way" and asked whether Ellendorf was aware of it. Docket 24-7; *see also* Docket 24-12. Wilkinson further stated that he did not "want a title issue to come up and complicate this transaction more than what is apparently occurring." Docket 24-7.

On May 11, 2022, the city council met in a special session and approved the first reading of Ordinances 745 and 746. Docket 24-11. The next day, Ellendorf emailed Wilkinson and expressed his opinion that the Howard community "is doing everything to try to scare" iRecover away from purchasing the Property. Docket 24-12 at 1. On May 17, 2022, Miner County passed a

resolution to convey the Property to iRecover upon receiving the outstanding property taxes. Docket 32-2.

On May 19, 2022, Wilkinson emailed the City's mayor and stated that there was a "notice problem" with the May 11, 2022, council meeting. Docket 24-13. Wilkson told the mayor that, "[t]o keep this clean so we do not face a legal challenge due to notice requirements, we need to start over." *Id.* Wilkinson recommended publishing a proper notice of hearing regarding Ordinances 745 and 746, and holding a city council meeting on June 7, 2022. *Id.*

On May 24, 2022, Ellendorf emailed the realtor, title company, and JSF's attorney, stating that "the [C]ity [of Howard] (and the adjacent bar) might be throwing some wrenches into this matter, but the buyers have decided just to accept the risk in closing this matter with [JSF] and deal with" the City and adjacent bar after closing. Docket 24-14 at 1-2.

 On June 7, 2022, the city council met ahead of the Property's scheduled closing date, during which it approved the first reading of Ordinances 745 and 746. Docket 28-3. iRecover representatives were present at that meeting. Docket 26 ¶ 17; Docket 31 ¶ 17.

But on June 10, 2022—and contrary to Ellendorf's May 24, 2022 email—iRecover notified JSF that it would not proceed with the purchase of the Property. Docket 34 ¶ 20. While iRecover cited "several" reasons, Docket 28-8 at 13-14, it identified three "very important" factors: (1) that JSF was unable to provide clear and merchantable title due to potential encroachments on the northern and southern boundaries of the Property; (2) that the new zoning

6

ordinances passed by the city council on June 7, 2022, "would complicate the proposed use of th[e] facility" and many people at the June 7, 2022, meeting "appeared in direct opposition proving the possibility of frustrating [iRecover's] future application" for a special exceptions permit; and (3) that the purchase was contingent on the county reconveying the Property to JSF. Docket 24-16 at 1-2; Docket 34 ¶ 20. When asked whether the ordinance requiring iRecover to obtain a special exception was a significant factor in iRecover's decision to terminate the agreement, iRecover's CEO testified that "[i]t was significant, as w[ere] the other factors. They were all significant. But I would say yes, it was significant." Docket 24-3 at 9. On June 12, 2022, Ellendorf emailed JSF's attorney, stating that "I can also say with confidence though that the city, or persons within this city, really really screwed this up for us. I am terribly embarrassed by the unwelcome (pitch forks and lanterns) that took place in my community over this whole ordeal." Docket 24-17 at 1.

The City ultimately passed Ordinances 745 and 746 on June 13, 2022, and published the Ordinances on June 16, 2022. Docket 34 ¶ 25. At no point did JSF or iRecover apply for a special exception permit from the City under Ordinance 746. Docket 26 ¶¶ 22-23; Docket 31 ¶¶ 22-23.

On July 27, 2022, JSF notified the City of its intent to sue in accordance with SDCL §§ 3-21-2 and 3-21-3(3). Docket 24-19 at 1. In the same letter, JSF also demanded that the City take immediate action to remove Ordinances 745 and 746. *Id.* at 9. The City notified JSF of its decision to repeal both Ordinances in mid-to-late August 2022. Docket 26 ¶ 33; Docket 31 ¶ 33. The

7

city repealed Ordinances 745 and 746 on January 5, 2023.[2] Docket 34 ¶¶ 28-29.

Meanwhile, in August 2022, JSF and iRecover continued to negotiate the sale of the Property. *See* Docket 26 ¶ 34; Docket 31 ¶ 34. iRecover lowered its offer from $1.1 million to $550,000 because the "economy ha[d] changed" since the June 2022 closing date. Docket 28-22. iRecover's CEO stated that it reduced the amount of its offer due to the encroachments and ongoing concerns involving Graf's alleged lien. Docket 28-8 at 18. But iRecover's CEO also agreed that the City was "no longer a problem for [iRecover] as far as concerns about entering into the transaction" with JSF because, by late August 2022, the City had indicated it would rescind Ordinances 745 and 746. *Id.* at 17. iRecover ultimately purchased the Property at auction in December 2022 and has operated a residential chemical dependency treatment center there since April 2023. Docket 34 ¶¶ 30-31.

In March 2023, JSF filed this lawsuit against the City, alleging violations of (1) 42 U.S.C. § 1983, (2) the Fair Housing Act (FHA), (3) the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), and (4) state tortious interference law. *See* Docket 1 at 5-10. JSF is seeking compensatory and

---

[2] On September 7, 2022, Wilkinson informed the City of proposed Ordinances 749 and 750, which would "remov[e] the group home language" from Ordinances 745 and 746. Docket 24-20 at 1. Wilkinson also informed the City that, after consulting with the attorney for the City's liability insurance carrier, the attorney stated that "he has an agreement with [JSF] that this repeal will not be used as any sort of admission of spot zoning[,] and it will further remove the threat for the discriminatory zoning allegation." *Id.*

punitive damages. *Id.* at 10-11. The City now moves for summary judgment on all of JSF's claims. Docket 25. JSF opposes the City's motion, Docket 30, and makes a cross motion for summary judgment on the City's affirmative defenses, Docket 21. The City's defenses include lack of standing, failure to exhaust administrative remedies, failure to provide notice, immunity from suit, accord and satisfaction, estoppel, waiver, and advice of counsel. *See* Docket 16 at 2-3. The City has withdrawn its defenses of failure to exhaust administrative remedies, failure to provide notice, accord and satisfaction, estoppel, and waiver, but it does oppose the remainder of JSF's motion. *See* Docket 33.

### Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no genuine dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and also identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of*

*Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment "must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik*, 47 F.3d at 957. Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Generally, when considering a motion for summary judgment, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In cases involving cross motions for summary judgment, however, the standard summary judgment principles apply with equal force, though the approach is slightly modified. *See Woodstone Ltd. P'ship v. City of Saint Paul*, 2023 WL 3586077, at *5 (D. Minn. May 22, 2023). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019).

## I.    The City's Summary Judgment Motion

The City argues that summary judgment is warranted on JSF's ADA and RA claim because JSF lacks standing. Docket 29 at 9-10. The City also

contends that JSF's § 1983 claim is not ripe. *Id.* at 18-22. Finally, the City maintains that summary judgment is appropriate as to JSF's ADA and RA, FHA, § 1983, and tortious interference claims because JSF cannot demonstrate that its alleged injuries and damages were caused by the City's enactment of Ordinances 745 and 746. *Id.* at 10-18. The court addresses each argument in turn.

### A. Standing – The ADA and RA

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, "forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). "Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *Id.* at 674. JSF brings its ADA claim under Title II. *See* Docket 1 at 8-9.

Title II of the ADA, captioned "Public Services," states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity must make reasonable accommodations when necessary to ensure meaningful access to programs or benefits, but need not do so if the accommodation would be unduly burdensome. *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009). Section 504 of the Rehabilitation Act (RA)

similarly prohibits the denial of services to a disabled person on the basis of his disability. *Davis v. Francis Howell Sch. Dist.*, 104 F.3d 204, 206 (8th Cir. 1997).

In order for JSF to avail itself of the private right of action under Title II of the ADA, it must have standing. "[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction." *Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (internal quotation marks omitted). "Article III standing requires (1) an 'injury in fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Dalton v. JJSC Properties, LLC*, 967 F.3d 909, 912-13 (8th Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Standing is determined as of the commencement of the lawsuit." *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 545 (8th Cir. 2018). "To survive a motion for summary judgment on this ground, a plaintiff must support his claim by 'set[ting] forth by affidavit or other evidence specific facts,' which are taken as true by the [district] court." *Id.*

JSF does not allege that it is a qualified individual with a disability. *See* Docket 1 at 8-9. Rather, JSF brings its ADA and RA claims on behalf of "the Property's future residents"—that is, "individuals who are handicapped or recovering from chemical dependency" and who would reside in iRecover's residential chemical dependency treatment facility. *Id.* at 8.

"Generally, courts have 'widely accepted . . . under both the RA and the ADA [that] non-disabled individuals have standing to bring claims when they

are injured because of their association with a disabled person.' " *Durand v. Fairview Health Servs.*, 902 F.3d 836, 843 (8th Cir. 2018) (quoting *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014)). The ADA states that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E). Although the RA does not explicitly provide for associational standing, courts have interpreted its language— specifically, that "[t]he remedies, procedures, and rights set forth in [T]itle VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act"—as allowing associational standing. *Durand*, 902 F.3d at 844.

In *Durand*, the Eighth Circuit addressed the circuit split concerning the scope of associational standing under the ADA and RA. *Id.* The court there compared the Second Circuit's broad application of associational standing under the ADA and RA in *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 280 (2d Cir. 2009), with the Eleventh Circuit's more narrow application in *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014). *Id.* In *Loeffler*, the Second Circuit held that, under the ADA and RA, "non-disabled parties bringing associational discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are

13

associated." 582 F.3d at 279 (Wesley, J., concurring). The *Loeffler* court held that two children had associational standing because the hospital failed to provide federally required services to their deaf father, forcing his two minor, non-hearing-impaired children to serve as on-call interpreters—making them miss school and involuntarily witness their father's suffering. *Id.* at 276, 279. The Second Circuit held that the children "need only establish that each suffered an injury independent from their parents that was causally related to the Hospital's failure to provide services to their parents." *Id.* at 280 (Wesley, J., concurring).

By contrast, the Eleventh Circuit in *McCullum* held that, under the ADA and RA, "non-disabled persons have standing to seek relief under either statute only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person. 768 F.3d at 1143. In deciding not to follow *Loeffler*, the *McCullum* court noted that permitting non-disabled individuals to "seek relief under the RA and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer . . . would mean that Congress granted non-disabled persons more rights under the ADA and RA than it granted to disabled persons." *Id.* at 1143. This, according to the Eleventh Circuit, went beyond the ADA and RA's stated purpose, which is to "promote the rights of the disabled." *Id.* at 1144. Notably, the Eighth Circuit declined to adopt the *Loeffler* or *McCullum* test, concluding that, under the

14

facts presented there, the plaintiff failed to satisfy the requirements for associational standing under either framework. *Durand*, 902 F.3d at 844-45.

Here, as in *Durand*, the undisputed facts demonstrate that JSF does not qualify for associational standing under either *Loeffler* or *McCullum*. Under *Loeffler*, JSF must establish that it suffered an injury independent from disabled persons that was causally related "to the denial of federally required services to the disabled persons *with whom the non-disabled plaintiffs are associated.*" *Loeffler*, 582 F.3d at 279 (Wesley, J., concurring) (emphasis added); *see Durand*, 582 F.3d at 844. But JSF has no association with any disabled persons as required under *Loeffler*. JSF, the owner and grantor of the Property—the Howard Hotel and Conference Center—had a contractual relationship with iRecover. It is iRecover, and not JSF, that has an association with recovering drug addicts—a generally protected class under the ADA and RA. *See* 42 U.S.C. § 12210(b). Because JSF has no association with disabled persons, it cannot show the causal link between itself and the denial of federally required services. *Loeffler*, 582 F.3d at 279. Although JSF claims that its monetary harm "directly stems from the violation of the ADA and RA[,]" Docket 43 at 4, it has not shown that it is associated with any disabled individuals, *see* 42 U.S.C. § 12182(b)(1)(E) ("It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.").

For similar reasons, JSF lacks standing under *McCollum*. JSF does not claim that it "was personally discriminated against or denied some benefit because of [its] association with a disabled person." *McCollum*, 768 F.3d at 1142; *see Durand*, 902 F.3d at 844-45. JSF states that "the City's actions were specifically and intentionally aimed at JSF and its decision to sell [the Property] to iRecover," and that the City undertook these actions to prevent the Property's sale. Docket 43 at 4-5. But the record does not show that JSF was "personally excluded, personally denied benefits, or personally discriminated against *because of [its] association with a disabled person.*" *McCullum*, 768 F.3d at 1143 (emphasis added). Again, the undisputed facts demonstrate that JSF lacks any association with disabled persons. Its contract was with iRecover, not with qualified individuals with disabilities like those recovering from drug addiction.

Because JSF does not have associational standing under *Loeffler* or *McCullum*, the City is entitled to summary judgment as a matter of law on JSF's ADA and RA claim. *See Durand*, 902 F.3d at 844.

### B. Ripeness of JSF's § 1983 Claim

Pursuant to the Fifth and Fourteenth Amendments, JSF alleges a regulatory takings violation under 42 U.S.C. § 1983. *See* Docket 1 at 5-6. The City moves for summary judgment on JSF's § 1983 claim, arguing that it's not ripe. *See* Docket 29 at 18-22.

"The issue of ripeness, which has both Article III and prudential components, is one of subject matter jurisdiction." *Dakota, Minn. & E. R.R.*

16

*Corp. v. South Dakota*, 362 F.3d 512, 520 (8th Cir. 2004). "The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention." *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (citation omitted). A claim is ripe if its "not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

For land-use claims such as JSF's, the Supreme Court has established a more specific ripeness inquiry. In assessing the ripeness of a takings claim challenging a zoning law, the Supreme Court held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019). This ripeness inquiry "is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Id.* at 193.

In *Williamson County*, the Supreme Court explained that a regulatory takings claim is not ripe when the governing body has the power to grant a variance, but the applicant never requested one. *Id.* at 193-94. "[W]hether it is analyzed as a deprivation of property without due process under the Fourteenth Amendment, or as a taking under the Just Compensation Clause of

17

the Fifth Amendment," the Court held that the claim was premature because no final determination could be made as to how the regulations would affect the property unless and until the applicant sought a variance. *Id.* at 200.

But courts have chosen not to apply *Williamson County*'s finality requirement in circumstances where the land-use regulation was altered to impose additional burdens after a plaintiff acquired the land, or where the regulation was aimed at a specific plaintiff. *See Chabad Lubavitch of the Quad Cities, Inc. v. City of Bettendorf, Iowa*, 389 F. Supp. 3d 590, 598-99 (S.D. Iowa 2019) (collecting cases); *see also Bannum, Inc. v. City of St. Charles, Mo.*, 2 F.3d 267, 272 (8th Cir. 1993). In *Bannum, Inc., v. St. Charles*, the Eighth Circuit held that a challenge to a city ordinance was ripe when the city, despite previously approving the property for use as a halfway house, amended its zoning ordinance in response to public opposition to add halfway houses to the list of conditional uses in that district. 2 F.3d 267, 269, 272 (8th Cir. 1993).

The basis of JSF's takings claim is that the City's contemplation and eventual enactment of Ordinances 745 and 746 demonstrate that the City "interfered with JSF's reasonable expectations that the Property could lawfully be used as a residential chemical dependency treatment center." Docket 1 at 5. The City, however, argues that the claim is not ripe because neither iRecover nor JSF applied for a special use permit that would have allowed iRecover to establish a residential treatment center in that zoning district. *See* Docket 29 at 21-22. In response, JSF contends that the *Bannum* exception applies because it is not challenging a permit denial, but rather it is challenging the

City's decision to enact an ordinance that imposed an additional, largely unreviewable process on a previously permitted use, prompting iRecover to abandon its purchase agreement. Docket 30 at 17. Because it is challenging the scheme of the ordinance itself, JSF maintains that the rule from *Williamson County* is inapplicable and the *Bannum* exception applies. *Id.*

The City argues that the *Bannum* exception is inapplicable because, unlike in *Bannum*—it never approved the proposed use before adopting Ordinances 745 and 746. Docket 39 at 16. The City asserts that, "[c]ontrary to JSF's claim, residential chemical dependency treatment centers were not previously allowed in" the C-1 Central Commercial District, and the City did not "inform JSF or iRecover that such a facility was permitted as a matter of right in the zoning district," as the court in *Bannum* reasoned. *Id.*

Taking the facts in the light most favorable to JSF, its § 1983 claim is ripe under both Article III and prudential ripeness principles—even though neither JSF nor iRecover applied for a special use permit, *see McKenzie v. City of White Hall*, 112 F.3d 313, 316 (8th Cir. 1997)—because the City's contemplation and enactment of Ordinances 745 and 746 targeted iRecover's purchase agreement with JSF, *see Bannum*, 2 F.3d at 272.

To start, JSF's claim is not based on a denial of a special use permit; rather, it is based on the City's decision to enact the Ordinances after JSF had already signed a contract with iRecover. *See* Docket 1 ¶ 30. Soon after JSF and iRecover signed a contract, the Howard community learned that iRecover planned to establish a residential treatment center on the Property and

19

convened two city council meetings. *See* Docket 24-11; Docket 28-3. On June 7, 2022, the city council approved the first reading of Ordinances 745 and 746. *See* Docket 28-3. Three days later, iRecover withdrew from the contract, later stating that the City's adoption of Ordinance 746 was a "significant reason" that "would complicate the proposed use of th[e Property]." Docket 30 at 6, 14-15. This evidence suggests that JSF's injury was sustained upon the City's enactment of the Ordinances, rendering its claim ripe regardless of whether it applied for a special use permit. Moreover, a judicial decision now "will largely settle the parties' dispute" without interfering with any ongoing administrative process. *Neb. Pub. Power. Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000). This case is fit for judicial review because it presents "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Id.* at 1038-39 (internal quotation marks omitted) (describing the ripeness standard).

Additionally, the rationale underlying a Takings Clause ripeness inquiry further confirms that JSF's claim is ripe. Such an inquiry "is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Williamson Cnty*, 473 U.S. at 193; *see also Pakdel v. City and Cnty. of San Francisco*, 594 U.S. 474, 479 (2021) ("The rationales for the finality requirement underscore that nothing more than *de facto* finality is necessary. This requirement ensures that a plaintiff has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm." (quoting *Horne v. Dept. of Agric.*, 569 U.S.

20

513, 525 (2013))). Again, there is evidence showing the City inflicted an actual, concrete injury to JSF when it contemplated and enacted Ordinances 745 and 746, prompting iRecover to withdraw from the purchase agreement. *See* Docket 24-3 at 9 (iRecover's CEO testifying that the City's contemplation of Ordinance 746 was a "significant" factor in iRecover's decision to withdraw from its contract with JSF). Thus, JSF's injury was complete once iRecover withdrew from the contract, and the claim is ripe.

### C. Causation

#### 1. The FHA Claim

Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(1)(B). It is also unlawful to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling. *Id.* § 3604(f)(3)(B). The FHA also forbids interference with a person's enjoyment of any right granted or protected by § 3604. *Id.* § 3617.

In its complaint, JSF alleges that, by adopting Ordinances 745 and 746, the City discriminated against the Property's future residents—individuals who are handicapped or recovering from chemical dependency—because the City sought to prevent the Property from being used as a residential treatment center for handicapped individuals. Docket 1 at 7. JSF asserts that it suffered

21

monetary damages when the sale of the Property was ultimately unsuccessful, allegedly as a result of the City's adoption of these Ordinances. *Id.* at 7-8.

The City argues that summary judgment should be granted on this claim because there is no evidence that the City's challenged conduct was the proximate cause of JSF's injuries. Docket 29 at 13. In response, JSF asserts that summary judgment is inappropriate because the City adopted Ordinances 745 and 746 in direct response to JSF's purchase agreement and potential sale of the Property to iRecover. Docket 30 at 12.

The elements of a prima facie case of discrimination under the FHA differ from case to case, depending on the allegations and circumstances. *See United States v. Badgett*, 976 F.2d 1176, 1178 (8th Cir. 1992). Where, as here, a plaintiff alleges disparate treatment under the FHA, Docket 1 at 7, to avoid summary judgment a plaintiff must present either (1) direct evidence of discriminatory intent, or (2) indirect evidence creating an inference of discriminatory intent, *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010).

In addition, a "claim for damages under the FHA—which is akin to a tort action" requires a plaintiff to establish that its injuries were proximately caused by a statutory violation. *Bank of Am. Corp. v. Miami*, 581 U.S. 189, 201 (2017) (citation omitted). Thus, "proximate cause under the FHA requires some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 202-03 (citation omitted). In *Miami*, the Supreme Court stated that "foreseeability alone is not sufficient to establish proximate cause under the FHA," *id.* at 201, because

22

> foreseeability alone does not ensure the close connection that proximate cause requires. The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, "be expected to cause ripples of harm to flow" far beyond the defendant's misconduct. Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel. And entertaining suits to recover damages for any foreseeable result of an FHA violation would risk "massive and complex damages litigation."
>
> Rather, proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged." . . . [W]e have repeatedly applied directness principles to statutes with "common-law foundations." "The general tendency" in these cases, "in regard to damages at least, is not to go beyond the first step."

*Id.* at 202-03 (internal quotation marks and citations omitted; cleaned up). "What falls within th[e first] step depends in part on the nature of the statutory cause of action, and an assessment of what is administratively possible and convenient." *Id.* at 203 (citations omitted). The Court in *Miami* specifically declined to "draw the precise boundaries of proximate cause under the FHA," and left it to the lower courts to "define, in the first instance, the contours of proximate cause under the FHA." *Id.* Notably, the Eighth Circuit has not yet defined proximate cause under *Miami*'s framework.

Taking the evidence in the light most favorable to JSF, JSF seeks a remedy for effects situated at the first step of the causal chain sufficient to survive summary judgment. The record shows there is "some direct relation" between JSF's monetary damages—stemming from iRecover's withdrawal from the purchase agreement—and the City's adoption of Ordinances 745 and 746. *See id.* at 202-03. iRecover contracted to purchase the Property from JSF in

late March 2022. Docket 24-2 at 1, 6. On May 9, 2022, during a special session regarding the Property's proposed use as a treatment facility, the city council authorized its attorney to draft Ordinances 745 and 746 because there was no "legal way" to "stop the sale or the operation" of a treatment center. Docket 24-8 at 5. On May 12, 2022, in response to that special session, iRecover's attorney stated that the City was "doing everything to try to scare" iRecover away from purchasing the Property. Docket 24-12. After the City adopted the Ordinances on June 7, 2022, iRecover's attorney stated that "many of [the [people] present appeared in direct opposition proving the possibility of frustrating [iRecover's] future application" for a special exception permit. Docket 24-16 at 2. Following these developments, iRecover withdrew from the purchase agreement. Docket 34 ¶ 20.

While the record establishes that iRecover backed out of the purchase agreement for several reasons, one "significant" factor that "would [have] complicate[d] the proposed use of th[e Property]" was Ordinance 746, which required iRecover to secure a special exception from the City to use the Property as a residential treatment facility. Docket 24-3 at 9; Docket 24-16 at 2 (listing "several reasons"). Because the evidence demonstrates "some direct relation" between iRecover's withdrawal from its contract with JSF—which resulted in JSF's monetary damages—and the City's adoption of Ordinances 745 and 746, summary judgment on JSF's FHA claim is denied.[3]

---

[3] The City also contends that JSF or iRecover's failure to request a reasonable accommodation under the Ordinances bars JSF's FHA claim. Docket 29 at 22. But the FHA permits private enforcement of the FHA "whether or not [an

### 2. The Tortious Interference with Business Relations or Expectancy Claim

To succeed on a tortious interference with business relations or expectancy claim under South Dakota law,[4] the plaintiff must prove (1) "the existence of a valid business relationship or expectancy;" (2) "knowledge by the interferer of the relationship or expectancy;" (3) "an intentional and unjustified act of interference on the part of the interferer;" (4) "proof that the interference caused the harm sustained;" and (5) "damage to the party whose relationship or expectancy was disrupted." *Hohn v. Spurgeon*, 513 F.3d 827, 829 (8th Cir. 2008) (applying South Dakota law); *Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56, 68 (S.D. 2002). To establish a claim of tortious interference, "there must be a 'triangle'—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 248 (S.D. 1999) (internal quotation marks omitted and cleaned up). In this case, such a triangle exists, consisting of JSF, iRecover, and the City.

---

administrative] complaint has been filed." 42 U.S.C. § 3613(a)(2); *see also Bryant Woods Inn, Inc. v. Howard Cnty. Md.*, 124 F.3d 597, 601 (4th Cir. 1997) (collecting cases). Because JSF need not prove that it requested a reasonable accommodation under the FHA before filing suit, the City's argument fails.

[4] "A federal court exercising supplemental jurisdiction over state-law claims applies state substantive law to those claims." *Christensen v. Quinn*, 45 F. Supp. 3d 1043, 1090 (D.S.D. 2014). South Dakota substantive law governs the state-law claim, and the State recognizes a cause of action for tortious interference with business relations or expectancy. *See Tibke v. McDougall*, 479 N.W.2d 898, 908-09 (S.D. 1992).

But the City argues that JSF cannot prove the fourth essential element: that the City's passage of Ordinances 745 and 746 caused JSF's financial harm. *See* Docket 29 at 15-16. The City asserts that, irrespective of its passage of the Ordinances, the evidence shows that multiple independent issues stalled the sale and prompted iRecover to purchase the Property at a reduced price. *Id.* at 16. Specifically, the City cites several issues: (1) JSF's "lack of transparency regarding the sale," (2) JSF's inability to deliver clear title, (3) unresolved encroachments, (4) the County had not yet agreed to extend the reconveyance to JSF, (5) Graf's claimed interest in the sale proceeds, and (6) no survey had been completed. Docket 29 at 16; Docket 39 at 14-15. JSF contends that even if the City's enactment of the Ordinances was not the sole cause of iRecover's withdrawal from the sale, that does not, as a matter of law, bar it from establishing causation. Docket 30 at 14-15. Because the record establishes that the City's enactment of Ordinance 746 was a "significant reason" that "would complicate the proposed use of th[e Property,]" JSF argues that this testimony is enough to survive summary judgment, because the various causes the City cites "acted in combination" to prevent the sale of the Property. *Id.* at 6, 14-15.

Taking the facts in the light most favorable to JSF, the record shows that the City engaged in conduct from which a jury could infer that the City's interference directly caused JSF's harm. *See St. Onge Livestock Co., Ltd. v. Curtis*, 650 N.W.2d 537, 542-43 (S.D. 2002). Again, iRecover's CEO testified that the City's passage of Ordinance 746 was a "significant" factor that would

26

have "complicate[d] the proposed use of th[e Property]." Docket 24-3 at 9; Docket 24-16 at 2 (listing "several reasons"). While the City argues that iRecover withdrew from the contract for multiple reasons—the CEO acknowledged those reasons while also identifying Ordinance 746 as a "significant" factor in the decision to abandon the purchase agreement. Docket 24-3 at 9; *see Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020) ("[T]he adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to [the] challenged [result].").

Because there is an issue of material fact as to what caused iRecover to back out of the contract with JSF, summary judgment is denied on JSF's tortious interference claim. *See* Restatement (Second) of Torts §§ 766(o) (September 2025) ("The question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact.").

### 3. The § 1983 Claim

Under the Fifth and Fourteenth Amendments, JSF alleges a regulatory takings violation under 42 U.S.C. § 1983. *See* Docket 1 at 5-6. "The Fifth Amendment, as applied to the States through the Fourteenth Amendment, provides that private property shall not be taken for public use, without just compensation." *Becker v. City of Hillsboro, Mo.*, 125 F.4th 844, 851 (8th Cir. 2025) (citation omitted). The Takings Clause is intended "to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo v.*

*Rhode Island*, 533 U.S. 606, 617-18 (2001) (citation omitted). Where, as here, a plaintiff alleges that a government regulation limits the use of property, the court must balance certain factors to determine whether a taking occurred. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Under the *Penn Central* balancing test, courts consider: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Id.*

Relatedly, it is well established that § 1983 "guarantees a federal forum for claims of unconstitutional treatment at the hands of state officials." *Knick*, 588 U.S. at 185 (citation omitted). To incur § 1983 liability, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Cmm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

JSF asserts that "the City, acting under color of law, enacted the Ordinances, which interfered with JSF's reasonable expectations that the Property could lawfully be used as a residential chemical dependency treatment center." Docket 1 at 5. After JSF already "invested resources in listing and preparing the Property for sale in reliance" on the lawfulness of its planned use as a residential chemical dependency treatment center, JSF contends that the City adopted the Ordinances in response to JSF's planned sale and iRecover's intended use of the Property. *Id.*

28

In moving for summary judgment, the City argues that JSF cannot establish that "but for the City's actions, iRecover would have purchased the Property for the originally agreed-upon price and under the terms of the [p]urchase [a]greement." Docket 29 at 18. The City maintains that "there were a multitude of problems surrounding the sale that caused it to stall and iRecover to offer a lower purchase price regardless of any actions by the City." Docket 39 at 13-14.

Taking the facts in the light most favorable to JSF, the court denies summary judgment on JSF's § 1983 claim. As described above, iRecover's CEO testified that, although there were multiple reasons for withdrawing from the purchase agreement, the City's passage of Ordinance 746 was a "significant" factor because it would have "complicate[d] the proposed use of th[e Property]." Docket 24-3 at 9; *see* Docket 24-16 at 2. The City's argument that multiple factors contributed to iRecover's withdrawal from the contract does not defeat JSF's claim at this stage because, on summary judgment, the court does not weigh competing explanations for that decision or assess witness credibility. *See Walz v. Randall*, 2 F.4th 1091, 1099 (8th Cir. 2021) (internal quotation marks omitted) ("A court at [summary judgment] stage 'does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.' " (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008))). This evidence is sufficient to raise a genuine issue of material fact as to the direct cause of JSF's harm. *See Brown*, 520 U.S. at 404 ("Where a plaintiff claims that a particular municipal action *itself* violates federal law . . .

29

resolving these issues of fault and causation is straightforward."). Thus, summary judgment is denied on JSF's § 1983 claim.

## II.    JSF's Partial Motion for Summary Judgment on Defendant's Affirmative Defenses

"An 'affirmative defense' is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." *Safeway Transit LLC v. Disc. Party Bus, Inc.*, 954 F.3d 1171, 1182 (8th Cir. 2020) (internal quotation marks omitted and cleaned up). A defendant bears the burden of proving an affirmative defense. *Burke v. Lippert Components, Inc.*, 112 F.4th 574, 579 (8th Cir. 2024); *Perrin v. Papa John's Int'l, Inc.*, 114 F. Supp. 3d 707, 720 (E.D. Mo. 2015). "Thus, if a defendant fails to make a showing sufficient to establish an essential element of a defense on which it will bear the burden of proof at trial, Rule 56(c) mandates the entry of summary judgment against it." *Perrin*, 114 F. Supp. 3d at 721 (citation omitted).

JSF moves for partial summary judgment on the City's affirmative defenses, which include lack of standing, failure to exhaust administrative remedies, failure to provide notice, immunity from suit, accord and satisfaction, estoppel, waiver, and advice of counsel. Docket 21 at 1. JSF also asserts that summary judgment is appropriate on "whether the Property could have been used as a residential chemical dependency treatment center prior to the enactment of Ordinances # 745 and #746." *Id.* The City asserts that following discovery, it has withdrawn the affirmative defenses of exhaustion,

notice, accord and satisfaction, estoppel, and waiver. Docket 33 at 2, 4. Those defenses are therefore stricken, and the court addresses the remaining defenses in turn.

### A. Lack of Standing

The City raises standing as an affirmative defense. Docket 16 ¶ 9. JSF contends that it has standing because it has suffered a concrete and particularized injury that is fairly traceable to the City's actions and can be redressed by this court. *See* Docket 22 at 8-10. Lack of standing, however, is not appropriately raised as an affirmative defense. *See, e.g., League of Women Voters of S.D. v. Noem*, 2022 WL 17581792, at *3-4 (D.S.D. Dec. 12, 2022) (analyzing the issue).

Although lack of standing is not an affirmative defense, standing must still be satisfied, and a defendant may properly raise it in an answer. *Id.* Indeed, the issue of standing can be raised by any party or the court at any time during the litigation. *See Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 983 (8th Cir. 2009). While the City's second amended answer does not identify the claims that JSF allegedly lacks standing to assert, *see* Docket 16 ¶ 9, its opposition brief challenges standing only with respect to JSF's ADA claim, *see* Docket 33 at 1-2. The court, however, already addressed the parties' standing arguments concerning the ADA. *See supra* pp. 11-16. The court can discern no reason to address standing, sua sponte, with regard to JSF's other claims. Thus, the court strikes the City's affirmative defense of standing and does not address standing as to JSF's other claims out of respect for the party

31

presentation rule. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) ("[A]s a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.' " (alterations in original) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)).

### B. Sovereign Immunity

The City asserts sovereign immunity as a defense to "JSF's state law tortious interference and punitive damages claims . . . to the extent that any money judgment that may be entered against the City exceeds the amount of liability insurance coverage." Docket 33 at 2-3; *see* Docket 16 ¶ 13. JSF moves for summary judgment on this defense, arguing that under SDCL § 21-32A-3, because "[t]he City is part of the South Dakota Public Assurance Alliance," it has "waived immunity to the extent of coverage." Docket 22 at 12.

The City does not dispute this point but asserts that summary judgment on this defense is improper because "JSF has made a demand well over the applicable limits under the City's liability policy." Docket 33 at 3. The City contends that this demand—combined with JSF's punitive damages claim under SDCL § 21-3-2—could result in an award exceeding the policy limits if JSF were to prevail at trial. *Id.* JSF maintains that summary judgment is appropriate because sovereign immunity is jurisdictional in nature, meaning that "[i]n the absence of constitutional or statutory authority, an action *cannot be maintained* against the public entity." Docket 36 at 2 (internal quotation

marks omitted and cleaned up). The question of sovereign immunity, according to JSF, is "whether the plaintiff can pursue the claim at all, not how much the plaintiff can recover." *Id.* The court agrees with JSF.

"Sovereign immunity is jurisdictional in nature." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Thus, sovereign immunity "protects public entities not only from a final judgment but also from having to defend a claim in court." *Cromwell v. Rapid City Police Dep't.*, 632 N.W.2d 20, 24 (S.D. 2001). "Unless the state has given its consent or has abrogated or waived its immunity legislatively, public entities are free from the liability of tort claims." *Id.* SDCL § 21-32A-1 provides that:

> To the extent that any public entity . . . purchases liability insurance and to the extent that coverage is afforded thereunder, the public entity shall be deemed to have waived the common law doctrine of sovereign immunity and shall be deemed to have consented to suit in the same manner that any other party may be sued.

SDCL § 21-32A-1. The City does not dispute that it is a member of the South Dakota Public Assurance Alliance. Docket 33 at 2-3. Thus, it has waived sovereign immunity and consented to be sued to the extent of the coverage under the policy, which is $1 million. *See* Docket 36 at 2. "Once this consent is given, and absent a valid statutorily recognized barrier to recovery, a public entity is in no better position than any other defendant to defeat a plaintiff's constitutional right to have [its] day in court." *Cromwell*, 632 N.W.2d at 27. Should this case proceed to trial and the jury returns a verdict exceeding $1 million on the state-law claims, any excess judgment would be uncollectible or subject to reduction or remittitur. *See* SDCL § 21-32A-1 (Sovereign

immunity is waived "to the extent [liability insurance] coverage is afforded thereunder."). But summary judgment is appropriate on this defense because, absent such relief, sovereign immunity would bar JSF from pursuing its state-law claim at trial. *See Cromwell*, 632 N.W.2d at 24. Thus, summary judgment is granted on the City's sovereign immunity defense.

### C. Advice of Counsel

An advice-of-counsel defense is an affirmative defense that turns on the defendant's state of mind. *Safeway Transit LLC v. Disc. Party Bus, Inc.*, 954 F.3d 1171, 1182 (8th Cir. 2020). Thus, the defense is available only where the offense includes a specific-intent or knowledge element regarding the defendant's awareness of the law that he is alleged to have violated. *See, e.g, United States v. Powell*, 513 F.2d 1249, 1251 (8th Cir. 1975) (holding that advice of counsel was not a defense to a felon-in-possession charge because the government was required to prove only that the defendant knowingly possessed a firearm, not that he knew his conduct was unlawful.).

As a preliminary matter, the City asserted an advice-of-counsel affirmative defense in its second amended answer but did not indicate to which of JSF's claims it applies. *See* Docket 16 ¶ 17. In moving for summary judgment, JSF argues that the City's advice-of-counsel defense is not viable as to its claims arising under § 1983, the FHA, tortious interference with business relations or expectancy, and punitive damages. Docket 22 at 13-17. In its opposition brief, the City challenges JSF's arguments but offers no explanation as to why this defense applies to JSF's § 1983 claim. *See* Docket 33 at 4-9. The

court therefore grants summary judgment on the City's advice-of-counsel defense as to JSF's § 1983 claim. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

### 1. The FHA Claim

JSF argues that advice of counsel is not a defense to a cause of action arising under the FHA because the relevant provisions do not "contain a scienter requirement, let alone a requirement that the defendant willfully violate[d] the law." Docket 22 at 15. The City asserts that because "JSF's allegation of disparate treatment under the FHA . . . makes the City's intent, motivation, and/or purpose in enacting the Ordinances directly at issue in this lawsuit," the court should deny summary judgment on this defense. Docket 33 at 6. According to JSF, however, the City is ignoring "the critical fact that the necessary state of mind to invoke the defense is not mere intent to act, but intent to violate the law." Docket 36 at 3.

The court denies summary judgement on the City's advice-of-counsel defense with respect to JSF's FHA claim. As stated above, a disparate treatment claim under the FHA requires the plaintiff to show (1) direct evidence of discriminatory intent, or (2) indirect evidence creating an inference of discriminatory intent. *Gallagher*, 619 F.3d at 831. The City contends that the advice-of-counsel defense is critical in assessing whether it possessed the requisite "intent, motivation, and/or purpose in enacting the Ordinances" for purposes of an FHA violation. Docket 33 at 6. The court agrees. "Where there is

dispute in the evidence as to whether the relevant and material facts within a defendant's knowledge were presented to counsel, the defense of advice of counsel should be submitted to the jury for a factual determination." *Hernon v. Revere Copper & Brass, Inc.*, 494 F.2d 705, 707 (8th Cir. 1974). The record reflects that the City consulted with attorney Wilkinson prior to enacting the Ordinances. *See* Docket 35-1 at 12; Docket 35-2 at 4; Docket 24-8 at 5. A genuine issue of material fact exists regarding what information was conveyed to Wilkinson and the scope of the advice he provided. Because the City's intent is directly at issue, it should be permitted to show that it obtained advice of counsel before enacting the Ordinances. The content and extent of that advice are questions for the jury. As such, the court denies summary judgment on the City's advice-of-counsel defense with respect to JSF's FHA claim.

## 2. The Tortious Interference Claim

For similar reasons, summary judgment is denied on the City's advice-of-counsel defense against JSF's state-law tortious interference with business relations or expectancy claim. As stated above, to prevail on a tortious interference claim under South Dakota law, a plaintiff must prove (1) "the existence of a valid business relationship or expectancy;" (2) "knowledge by the interferer of the relationship or expectancy;" (3) "an intentional and unjustified act of interference on the part of the interferer;" (4) "proof that the interference caused the harm sustained;" and (5) "damage to the party whose relationship or expectancy was disrupted." *Hohn*, 513 F.3d at 829. Notably, the third

36

element requires proof that the defendant acted intentionally and without justification.

JSF is correct in asserting that tortious interference does not require proof that the defendant knew its conduct was unlawful. *See* Docket 22 at 16; *Venture Commc'ns Coop., Inc. v. James Valley Coop. Tel. Co.*, 492 F. Supp. 3d 946, 961 (D.S.D. 2020) (holding that interference with another's "prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action"). But here, the inquiry into whether the interference was *unjustified* is fact-intensive and may turn on the defendant's motivation and purpose in acting. Where a defendant asserts that it acted in good faith reliance on the advice of counsel, that evidence may bear on whether the challenged conduct was undertaken with an improper motive or was otherwise unjustified. *See Johnson v. United Parcel Serv., Inc.*, 946 N.W.2d 1, 15 (S.D. 2020) (holding that evidence of counsel's advice and its effect on the defendants' state of mind was relevant to the knowledge/intent inquiry in a bad faith action and should have been presented to the jury).[5] In such

---

[5] In assessing a defendant's state of mind and knowledge under South Dakota law, advice of counsel "may be considered," and evidence regarding what counsel advised and the defendant's claimed good-faith reliance on that advice is relevant to whether the conduct was undertaken with improper motive or knowledge. *Johnson v. United Parcel Serv., Inc.*, 946 N.W.2d 1, 15 (S.D. 2020). Although *Johnson* arose in the context of a bad faith claim, the Court's reasoning regarding the relevance of advice-of-counsel evidence applies equally here, where the defendant's intent or justification is at issue. The South Dakota Supreme Court has held that excluding such evidence and prohibiting its consideration by the jury was reversible error. *See id.*

circumstances, advice of counsel is not offered to negate intent to act, but rather to inform the justification analysis that lies at the heart of the tort.

Here, the record shows that the City consulted with counsel before passing the Ordinances. *See* Docket 35-1 at 12; Docket 35-2 at 4; Docket 24-8 at 5. Viewing the evidence in the light most favorable to the City, a genuine dispute of material fact exists regarding what information was provided to counsel and the scope of the advice received. Those disputed facts are relevant to assessing whether the City's conduct was unjustified, and they cannot be resolved at the summary judgment stage.

Because the justification element of JSF's tortious interference claim is intertwined with the City's asserted reliance on counsel in passing the Ordinances, and because material factual disputes remain regarding such reliance, the advice-of-counsel defense presents questions properly reserved for the jury. Thus, summary judgment is denied on the City's advice-of-counsel defense as to JSF's tortious interference claim.

### 3. Punitive Damages

Finally, summary judgment is also denied on the City's advice-of-counsel defense with regard to JSF's claim for punitive damages. "[T]o rely upon the advice of counsel in his defense, a defendant must show that he: (i) fully disclosed all material facts to his attorney before seeking advice; and (ii) actually relied on his counsel's advice in the good faith belief that his conduct was legal." *United States v. Naushad*, 68 F.4th 380, 387 (8th Cir. 2023) (alteration in original and internal quotation marks omitted). "Where

38

there is no conflict in the testimony as to what the circumstances were, the court has no need for a finding of the jury." *Hernon*, 494 F.2d at 707. But "[w]here there is dispute in the evidence as to whether the relevant and material facts within a defendant's knowledge were presented to counsel, the defense of advice of counsel should be submitted to the jury for a factual determination." *Id.*

JSF argues that summary judgment is warranted because the City cannot prove that it "relied on its counsel's advice in the good faith belief that its conduct was legal." Docket 22 at 17. JSF contends that, in fact, the record is devoid of any evidence that the City asked its attorney, Todd Wilkinson, whether "enacting Ordinances 745 and 746 would violate any laws or interfere with the contract between JSF and iRecover," much less that it relied on any such advice. Docket 36 at 5. JSF cites Wilkinson's deposition testimony, in which he explained that his task was to "get some language that [would] allow iRecover to fit into a usage on Main Street." Docket 22 at 17 (quoting Docket 24-23 at 2). According to JSF, the only evidence of Wilkinson's involvement in the matter is his guidance in drafting Ordinances 745 and 746. *Id.*

The City contends that "Wilkinson's legal advice went well beyond just drafting the ordinances." Docket 33 at 8. The City asserts that Wilkinson also advised the city council that in his opinion, the treatment center "did not fit on the permitted [zoning] list and [the City's] best approach would be to put it under a special exception." *Id.* at 7 (quoting Docket 35-1 at 12). The City also points to deposition testimony from a city council member, who stated that

39

Wilkinson advised that, "based on what [they] knew about what [iRecover] intend[ed] to do, [the existing] ordinance would not allow [iRecover] to operate." *Id.* (citing Docket 35-2 at 4); *see also* Docket 35-3 at 5, 7 (testifying that Wilkinson advised the city council that "a special exception was probably the best route" and that adopting the Ordinances "would provide . . . a clear definition").

Viewing the evidence in the light most favorable to the City, there is a genuine issue of material fact concerning what information was provided to counsel and the scope of the advice received. The City maintains that "the advice of counsel defense is probative on the issue of whether the City acted 'intentionally, knowingly, recklessly, or with callous indifference' "— mental states the plaintiff must prove at trial to succeed on a punitive damages claim. Docket 33 at 9 (quoting Docket 1 ¶ 24); *see also Biegler v. Am. Family Mut. Ins. Co.*, 621 N.W.2d 592, 605 (S.D. 2001). The court agrees. Moreover, whether the City acted in good faith reliance on counsel's advice directly bears on JSF's burden to show that the City acted intentionally or with willful and wanton misconduct. *See* SDCL § 21-3-2. On this record, the information provided to counsel and the extent of the advice received present a genuine issue of fact for the jury. Thus, summary judgment is denied on the City's advice-of-counsel defense as to JSF's punitive damages claim.

### D. Whether iRecover's Proposed Use Was Permissible Under the Ordinance Structure Prior to Enactment of Ordinances 745 and 746

JSF seeks summary judgment on whether a residential treatment center was a permissible use under the zoning scheme in effect before the enactment of Ordinances 745 and 746. Docket 21 at 1; Docket 22 at 18. "Zoning ordinances are interpreted according to the rules of statutory construction and any rules of construction included in the ordinances themselves." *Peters v. Spearfish ETJ Plan. Comm'n*, 567 N.W.2d 880, 883 (S.D. 1997). Issues of statutory construction present questions of law, and questions of law are particularly appropriate for resolution at the summary judgment stage. *In re Certification of a Question of L.*, 981 N.W.2d 325, 329 (S.D. 2022); *TeamBank, N.A. v. McClure*, 279 F.3d 614, 617 (8th Cir. 2002).

"The purpose of statutory interpretation is to discover legislative intent." *South Dakota v. Long Soldier*, 994 N.W.2d 212, 217 (S.D. 2023) (internal quotation marks omitted). "In conducting statutory interpretation, [courts] give words their plain meaning and effect, and read statutes as a whole." *Reck v. S.D. Bd. of Pardons and Paroles*, 932 N.W.2d 135, 139 (S.D. 2019). The court's analysis necessarily begins with the statute's text. *Stockwell v. McCook Cnty. Bd. of Comm'rs*, 2 N.W.3d 236, 241 (S.D. 2024). "If this inquiry reveals language that is clear, certain, and unambiguous, [the court's] only function is to declare the meaning of the ordinance as expressed." *Id.* (citation omitted). Only when an ordinance is ambiguous do courts "look to the legislative history, title, and the total content of the legislation." *Id.* (citation omitted).

41

The Property is located in the City's C-1 Central Commercial District, which is governed by Article 19 of the City's zoning ordinance. *See* Docket 24-4 at 52, 59. As of May 9, 2022—prior to the enactment of Ordinance 745—Article 19 provided, in pertinent part:

**C-1 CENTRAL COMMERCIAL DISTRICT**

**Intent**: Central Commercial District for business establishments oriented to the pedestrian shopper.

**Permitted Uses**: The following uses and structures shall be permitted in the C-1 Central Commercial District:
1. Retail establishments;
2. Service establishments;
3. Entertainment services;
4. Financial institutions;
5. Local, state and federal offices and services;
6. Newspaper and printing firms;
7. Offices;
8. Parking lot and/or garages;
9. Apartment using the upper floors of commercial buildings;
10. Off-site signs.

\*\*\*

**Prohibited Uses**:
1. Blacksmith shop;
2. Coal or lumber yards;
3. Metal working shop, tinsmith or plumbing shop employing more than five (5) workers on the premises;
4. Milk or soft drink bottling or distributing stations employing more than ten (10) workers;
5. Poultry or livestock killing, dressing or live storage;
6. Manufacturing of any kind;
7. Oil stations, auto cleaning establishments or automobile, truck, or machinery sales when located within a radius of 150 feet of a church edifice, hospital, or public school.

*Id.* at 59, 62. As noted above, "Service establishments" were listed as a permitted use in the City's C-1 District, but the term was not defined before the enactment of Ordinance 745. *Id.* at 59; *see* Docket 22 at 19. "When a statute

does not define a term, [courts] should construe the term according to its accepted usage and avoid a strained, impractical or absurd result." *Sioux Falls v. Ewoldt*, 568 N.W.2d 764, 768 (S.D. 1997); *see also Riegelsberger v. Air Evac EMS, Inc.*, 970 F.3d 1061, 1064 (8th Cir. 2020) (stating that courts interpreting a statutory term "generally look to dictionary definitions in the absence of a statutory definition").

A plain reading of "service establishment" in the context of the entire ordinance governing the C-1 Central Commercial District shows that "service establishment" is unambiguous and, therefore, its ordinary meaning controls. An establishment is a "place of business" or "a public or private institution ([such] as a school or hospital)." *Webster's Third New International Dictionary* 778 (2002). And a service is "conduct or performance that assists or benefits someone or something," or "useful labor that does not produce a tangible commodity." *Id.* at 2075. As such, the court concludes that a "service establishment" is a place of business, or a public or private institution, that— by its conduct or performance—assists or benefits someone or something, or provides useful labor without producing a tangible good for a customer or client. *See Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1231 (10th Cir. 2016) (defining "service establishment" under its ordinary meaning). "In other words, a service establishment is—unsurprisingly—an establishment that provides a service." *Id.*

The City relies on the stated intent of the Central Commercial District, which is "for business establishments oriented to the pedestrian shopper."

Docket 33 at 11 (internal quotation marks omitted); *see also* Docket 24-4 at 59. It argues that residential chemical dependency treatment centers are neither listed as a permitted use under the Ordinance nor compatible with the district, given their "residential" character. *See* Docket 33 at 11-12. According to the City, "a residential facility providing long-term chemical dependency . . . treatment is not a commercial business oriented toward pedestrian shoppers, and it is wholly within the purview of the City to interpret and enforce its land-use ordinances in accordance with the intent of those ordinances." *Id.* at 12; *see also* Docket 35-1 at 3 (Wilkinson testifying that the treatment center was "more akin to an extended stay facility.").

But interpreting the term "service establishment" under its ordinary meaning (i.e., an establishment that provides a service) yields neither ambiguity nor an absurd result. *See Ewoldt*, 568 N.W.2d at 768. iRecover's residential chemical dependency treatment center is a business that assists individuals struggling with substance use and abuse disorders. The service it offers does not result in a tangible product for a customer or client. Moreover, the residential nature of this business does not, by itself, prevent it from qualifying as a "service establishment" under the zoning ordinance. Indeed, the ordinance already permits apartments on the upper floors of commercial buildings, demonstrating that a residential component is not inherently incompatible with commercial uses in the district. *See* Docket 24-4 at 59. Further, the residential treatment center's focus on delivering care as a service does not conflict with the district's intent to serve pedestrian-oriented

44

businesses, particularly because the ordinance already contemplates mixed

uses, including residential apartments on upper floors of commercial buildings,

newspaper and printing firms, and offices. *See id.*

The court's plain reading of "service establishment" remains appropriate

when considered in the context of Article 19 as a whole. *Reck,* 932 N.W.2d at

139 ("In conducting statutory interpretation, [courts] give words their plain

meaning and effect, and read statutes as a whole."). Article 19 sets forth the

City's schedule of zoning district regulations, which designates nine zoning

districts.[6] *See* Docket 24-4 at 52-69. Interpreting "service establishment" as

defined above is consistent with the structure and purpose of Article 19. *See id.*

The City offers no alternative district in which a residential treatment facility

would have fit more appropriately, and the court can discern none after

reviewing the entirety of Article 19.

Finally, the City contends that "it is wholly within the purview of the City

to interpret and enforce its land-use ordinances in accordance with the intent

of those ordinances." Docket 33 at 12. The City points to testimony from city

council members explaining why they believed a residential chemical

dependency treatment center was incompatible with the C-1 Central

Commercial District. *See id.* at 12-13. The City posits that the council's

---

[6] The nine zoning district are: A-1 Agricultural District, R-1 Single Family
Residential District, R-2 General Residential District, R-3 Residential
Manufactured Home District, C-1 Central Commercial District, H-C Highway
Commercial District, I-1 Industrial District, CN Conservation District, and FP
Flood Plain District. *See* Docket 24-4 at 52-69.

interpretation of the land-use ordinance is entitled to deference. *See id.* at 11, 15-16. This argument is also unavailing.

Although courts may "consider and give weight to the construction of the ordinance by those administering the ordinance[,] . . . an administrative construction is not binding on the court" when the text of the ordinance is unambiguous. *Stockwell*, 2 N.W.3d at 240-41 (citation omitted) (holding that, because the ordinance's "textual provisions are unambiguous," the board of adjustment's "interpretation of the 2014 ordinance is not entitled to deference"). Here, the text of the ordinance is unambiguous, so the city council's interpretation of the ordinance is not entitled to deference. Because the court finds that a residential chemical dependency treatment center was a permissible use prior to the enactment of Ordinances 745 and 746, the court grants summary judgment in favor of JSF on this issue.

## CONCLUSION

Based on the foregoing, it is ORDERED:

1. That the City's motion for summary judgment (Docket 25) is granted in part and denied in part. The motion is granted with regard to JSF's ADA claim. The City's motion for summary judgment is denied as to JSF's FHA, § 1983, and state-law tortious interference with business relations or expectancy claims.

2. That JSF's partial motion for summary judgment (Docket 21) is granted in part and denied in part. The motion is granted with regard

to the City's affirmative defense of sovereign immunity. The motion is denied as to the City's affirmative defense of advice-of-counsel.

3. That JSF's partial motion for summary judgment is also granted concerning the issue of whether a residential chemical dependency treatment center was a permissible use prior to the enactment of Ordinances 745 and 746.

4. That the City's affirmative defenses of failure to exhaust administrative remedies, failure to provide notice, accord and satisfaction, estoppel, and waiver have been withdrawn by the City and are stricken.

5. That the City's affirmative defense of standing is stricken.

Dated January 5, 2026.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE